The last case was streamed, yes? The last one was streamed. No, I believe that he stopped the shooting from this point. The first two have been streamed. Right, so they were able to hear the last two arguments. The previous case, the desk case, was streamed. I have to find out about that. Well, anything that wasn't, I need in tape form. Thank you. Okay, and so let's make sure we identify who's in the courtroom. Just for the record, of course, the panel of judges is present. We have our deputy clerk at the clerk station. We have a court security officer in the courtroom at the door. Those are my two law clerks, and I see the two counsel present, and everybody else is absent, just for the record. And the court security officer, if anybody tries to come in, you will notify us. I may not be paying attention, so just say something if somebody tries to come in. Okay, so here we are. This is the Woodard. I keep wanting to say Woodward. It's the Woodard case. So we still have Mr. Ellman there and Mr. Callister is at the counsel table. You may proceed. Thank you, Your Honor. May it please the Court once again, Robert Ellman for the United States. The court in the Woodard case committed the same error committed in the other asset forfeiture cases when the court refused to enter the criminal forfeiture money judgment in the amount requested by the government, which in this instance is $200,000. The court did express a number of rationales on the record in doing so. First is that the court has discretion under 18 U.S.C. Section 3553A to fashion an amount that it deems reasonable in imposing a forfeiture judgment. Again, the government has cited a number of cases saying that the punishment regime is to be analyzed apart from the forfeiture regime, and we stand on those cases. The court also acknowledged in this instance that it was mandatory, I cite you to page 114, but then reduced the amount to $100. That reduction appears to be arbitrary because it's not tied to any statement the court made about, you know, what the proceeds should otherwise be other than the amount requested by the government. The court also noted that there were no traceable proceeds here, and the example was if Ms. Woodard had bought a boat, the government could forfeit the boat. And that's correct as far as it goes, but the government may seek a money judgment or may seek forfeiture of specific property, and it elected to seek a money judgment here, as it did in the other cases. Then finally, the court referred to rehabilitation and Ms. Woodard's ability to repay her debt to society. Kennedy, may I ask, just as an information point, because, you know, we're spending all this time and the government is spending the money to send you to San Francisco, what interests are being pursued in these cases where it appears from all appearances that this money will never be recovered by the United States? And the United States may be entitled to it, but it would help me to sort of understand what is at stake here. What happens to this judgment of forfeiture if we reverse this accord and then a forfeiture judgment is entered in this case? And I'm sorry, I get the amounts mixed up with it. Some million dollars here, the proceeds? $200,000. $200,000. I get the cases confused. So anyway, $200,000. What happens to that, and what's the point? Well, that puts in the hands of the United States an executable judgment in the proceeds amount. It can then pursue any assets that Ms. Woodard may come into in the future and substitute those in order to satisfy the judgment either in full or in part. And we don't know, of course, what Ms. Woodard is going to be earning in the future or whether she'll come into money that would be forfeitable under that money judgment. It's very broad. It's like any other money judgment, of course. It's non-dischargeable. I believe that's correct, and I believe that's because the Federal government holds the judgment. So if she were to get a million-dollar inheritance, the government would get its $200,000? That's right, Your Honor. And that's the purpose of it as far as the government's concerned. And, of course, in addition to that ---- Will she get that lucky pull on the stock machine? It could be, if she's in Las Vegas, certainly. And, of course, Congress has expressed the punitive rationale for these forfeiture judgments as well. Some defendants respond to incarceration. Others do not. Others are recidivists, and the threat of spending time in prison doesn't deter them. So there's a financial threat as well. If a defendant were only required to repay what he or she got out of committing a crime, then there really would be no disincentive. And I think that's the actual policy reason behind why these criminal forfeitures are allowable. Now, in Ms. Woodard's case, there are a number of arguments made in the answering brief. The first is that there has to be $200,000 in identifiable proceeds, but that's incorrect. The case law says that if the government seeks a money judgment, tracing is not required. There was no tracing by way of example in the Casey decision, but we have also cited a Second Circuit case called Awad where the court specifically says that tracing is not required. And, of course, if tracing were required, it would defeat the purposes of forfeiture in a money judgment. If a defendant has no assets, there's nothing the government can trace. So it would effectively eliminate asset forfeiture in those cases. And Casey cites a case called Ginsburg where the court says if a defendant spends money from a crime on wine, women, and song, the government should still be able to get that judgment and collect that amount. Ms. Woodard also argues here that forfeiture is limited to what Woodard personally gained or received, and that's incorrect. And the Casey decision stands as an example of that, because under those facts, the co-defendants or co-conspirators received most of that money, and yet the judgment was for the full $7,000 amount. There's no reduction. In other words, for amounts split with co-defendants, there's no equitable reduction. Casey rejects that because it rejects that Croci decision, which was based in part on equitable considerations, and Croci was a district court opinion that was overruled specifically in the Vampire Nation case, which we've also cited. And again, that language in Casey is that the statutes mandate a defendant forfeit a very specific amount, the proceeds of his criminal activity, as opposed to what he received. And again, in the conspiracy context, that means all of the money that was generated from the conspiracy, not simply what was attributable to it. And how much would that be? In this case, all we know is it's a greater amount, Your Honor. We charged one overt act, and the loss amount from the overt act was $122,900. But it's the same conspiracy that went on for three and a half years and involved the multiple transactions. So theoretically, you could have, I mean, it isn't agreed to in the plea agreement here, but presumably you could have charged $1 million in this instance as in the other. It's a little peculiar because you have two co-conspirators with differing amounts that they've agreed to in the plea agreement. That's true, Your Honor. And theoretically, if we were able to seek that amount in one case, we could have sought it in all cases if it's the same conspiracy. You know, you have different types of conspiracies and different types of activity within them. I'm not sure. Well, these three cases that we've heard this morning, is this all the same conspiracy or are these three separate conspiracies? What's the connection between the three, other than Judge Mahan's consistent approach to these cases? There's no factual connection between Mr. Newman's case and the Woodard-Tedesco case. The Woodard-Tedesco conspiracy is the same conspiracy. Okay. But Tedesco admitted to $1 million and Ms. Newman's only admitting to $200,000. Yes, Your Honor. That's what the plea agreement says. And did Judge Mahan make a finding as such with respect to the amount of proceeds in the Woodard case? No, he did not, Your Honor. Again, that was an undisputed amount, so the government had no reason to request a hearing. The Court's only concern was that it wasn't traceable to proceeds in the defendant's possession, but again, that's not a necessary step. But if it goes back, wouldn't that be incumbent upon him to do? Only to make the finding, and obviously you'll help him make that finding, I'm sure. No, it's actually unnecessary, Your Honor, because the plea memorandum standing alone supports that, because there's a $200,000 stipulation there. Now, in Libretti, the Supreme Court said that if that amount was problematic in the eyes of the judge, then a hearing would be the — an evidentiary hearing would be the appropriate way to handle it. And of course it would be, and Rule 32.2 contemplates that. But that's for amounts that are in dispute, which this is not. And again, this is not an instance where Judge Mahan reduced the forfeiture judgment to the loss amount. He virtually eliminated it altogether with the $100 judgment. So we don't feel that any evidentiary hearing is necessary because the plea memorandum standing alone supports that. Let me just show you. I feel very uncomfortable, very uncomfortable about the fact that Mr. D'Esco, who has nothing, is hit with a million-dollar exposure, and Ms. Woodward, Woodard, who has many properties, obviously they're underwater, but nevertheless is a person of means, is only liable for $200,000 with respect to the same conspiracy. Isn't there something unfair about that? Well, I understand your concern, Your Honor, and I have to add that I can't explain the discrepancy in the two, in the two amounts. I don't know what the basis for it is. It's not in this record. And frankly, even going beyond the record, I don't know what the answer to the question  is. I would have to speculate about why those amounts are different, and I'm equally uncomfortable doing that. All right. Thank you, Your Honor. Thank you. We'll now hear from the defendant. Good morning, Matthew Collister. I appreciate the opportunity to be here before you, Justice Kaczynski and Justice O'Scanlan and Justice Graber. As the Court is no doubt aware, I'm somewhat new to this case, but I've done my best to try to get up to speed as best I can. I wanted to correct a couple of factual, I think, inconsistencies. As referenced in the pre-sentence report that is part of the record, she has a negative net worth of over $795,000. So she's anything but a woman of means. She, Mrs. Woodard, contrary to what may be the belief of ---- Could you speak a little more loudly? I'm sorry. Thank you. Yes. I apologize. I heard you, but it would be helpful if you ---- I want to get it for the record. So she's not a woman of means. I do not believe in ---- Well, she has three-quarters of a million dollars in assets. Obviously, they're subject to liabilities, offsetting liabilities.  But this is not somebody who is without property. Property that has no value. Welcome to Las Vegas, where 85 percent of the homes in the valley are upside down. It's an issue we deal with on a daily basis. I know that problem exists here, but Las Vegas is legitimately the foreclosure capital of the nation. It's what I deal with on a daily basis. It is a crisis of unparalleled ---- and at least in my record, living in Las Vegas all my life, her properties, as set forth in the pre-sentence report, will never have any positive value. She's ---- But her ability to pay is not really a factor, is it, in the legal analysis? I think that's correct. I think the Court is correct. I think Justice ---- I'm sorry. Judge Mahon was correct when he made that same determination. I think when you look at the actual transcript and go through it at length, and I've had the benefit of hearing some of the other arguments, at least in regards to Ms. Woodard, my client, Judge Mahon very clearly understood that under Casey that forfeiture was requisite, that there had to be some forfeiture. Right. But there seems to be no serious argument here that $100 is actually the proceeds of the conspiracy, so he was doing something else. And I guess my question to you is the same as in the previous case. Why isn't your client bound by the plea agreement that knowingly and voluntarily agrees to the criminal forfeiture of $200,000? She obviously executed the plea agreement. She was, as the Court is aware, a very cooperative witness, has been in more than 15 ongoing investigations. Whatever she understood or agreed to, she was scared to death. This was the first time she'd been charged with a crime in her life. I don't know what happened between her and her counsel, but her role was very limited. She was ---- As the case reaches us, this plea agreement is voluntarily entered into and is binding in all other respects, correct? Correct. I agree. So why wouldn't the agreement for forfeiture be binding as well? I would suggest that the decision reached by Judge Mahon, the trial court judge, was within his discretion or what's appropriate, just as perhaps the $100,000 seems arbitrary and capricious, I would suggest the $200,000 is arbitrary and capricious. Her role was that of a scrivener. She was ---- $200,000 is what she agreed to. I don't see how you can say that's arbitrary and capricious when both sides for controversy agree to something. How is that arbitrary? I think it's respectfully within his discretion to simply say, as he did, this is much more of a sanction and it does not reflect that which she received, what she benefited. That restitution did address, the $200,000 restitution did address that. How do you deal with Casey and all of our other cases that say it doesn't matter? It's punitive and it's mandatory and there's nothing, you don't need to trace it or anything. How do you deal with those cases? It does, but Casey also has language that I think is equally important, indicating that this is not. I'm sorry, which? This is Casey? Yeah.  Okay. I just have one more comment to make in the Casey decision which seemed to indicate that there was not intended to be some kind of necessity, a ball and chain that would follow you for the balance of your life. And that's obviously the argument that in the mind of the trial court judge bore out, but let me try to, I apologize, I'm scrambling to find my own site. Those are my pleadings. I apologize. Here we go. The mandatory forfeiture is concerned not with how much an individual has, has, but with how much he received in connection with the commission of the crime. That's found I believe at 444 Fed 3rd 1071 in the language of Casey. It's also referenced in McGinty. You're reading from page 1071, no? I'm reading from a site that I think was found within McGinty that references Casey as well as 28 U.S.C. McGinty is the Tenth Circuit case that you're relying on. Yeah. Okay. And McGinty references some language in Casey that I think does give the trial court judge some level of discretion to, as Judge did herein, essentially say the $200,000 restitution represents a sanction. The forfeiture is additionally required under Casey and the statute. I'm going to choose $100,000. Respectfully, I tend to agree with what Your Honor was saying earlier. There should have been some findings. I think if the Court chooses to remand, what should happen is there should be specific findings made as to what each individual received. She received a $7,000 commission acting as a real estate agent. Is it your argument that what the person received in commissions is the proceeds of the conspiracy, or isn't it the loans that were fraudulently made? I don't know that I understand the question clearly, but I don't think it's the proceeds of the conspiracy that should be the level of the sanction that is the forfeiture. But the forfeiture is supposed to be, by statute, the proceeds of the illegal activity. So we have to look at what's the proceeds. Respectfully, I understand the entirety of the proceeds that had there been a finding below that she received was $7,000, her half of the commission for the sale. That was the extent of her participation. You know, I tend to be the person who received the $7,000. I'm sorry? Where do you get that? That's her half of a commission. That's the extent of her participation, Your Honor. She was the broker. I understand what you're saying. I'm saying where in the record do you get this? It's not in there. That's why I think there should have been specific findings to perhaps to reduce the judgment, as the government seeks now to do so, to say that we want some substitute. So you're allying with something that's not in the record? The way – I mean, if you try to get something in the record below and the district court keeps it out, then you can say, you know, here's a thing that's not in the record and the district court should have let it in, but you can't just pull a fact that's in there and say we want a do-over because we now have a fact. I'm – I apologize. I'm merely suggesting this. There was no attempt by the government that I can find in the record to seek a very specific finding as to Ms. Woodard, as to what the level of what she received. And it's my understanding that that is at least, when you are determining forfeiture, a component of how you would have established that. And I wish there had been such a specific hearing. I'm sure you – maybe you wish, and that's interesting, but she, in fact, signed an agreement where she said the amount of forfeiture she stipulates is $200,000. I – why would the government then say, oh, she stipulated $200,000, we'll go ahead and try to prove something else? She's already agreed to $200,000 right away. I understand. The pre-sentencing report that established what her negative net worth was not available to the time, as I understand it, that the adjudication was made. So whoever did what they did below, I can't apologize for. All I can suggest is that had all of the factors been taken into consideration, had there been a separate hearing to determine what the level of participation would have been, I think that would be the appropriate remand. I think that's what should have occurred in this case. Mr. Callister, I need to ask you, I saw that you were in the room when Ms. Naylor, representing her client, had the colloquy with the bench. Yes. And I guess my question to you would have to be, how do you – how would you distinguish your case from her case or from the Tedesco case? I'm not certain that I would seek to distinguish. I think in both instances, there should be an appropriate remand to determine what each appropriate forfeiture level should be. I find myself in the opposition of almost agreeing with the government to the extent that there should have been a sanction that was reasoned and it was not pulled from whole error. I understand the concern about the $100 as opposed to – and I understand the judge saying, oh, this sounds like Les Mis and making statements of this is going to be a general matter of debt forever. Jean Valjean and all of that? I'm sorry? Mr. Javert and all of that? All of that. Okay. I think there should have been a reasoned set of hearings to determine what was an appropriate forfeiture given the individual participant's role. I have one further question. I must say I'm mystified. Why are we in a closed hearing at this moment? Because she's still participating in other ongoing investigations and giving testimony. I see. All right. Very well. Thank you very much. Thank you, everybody. I haven't heard anything, and I couldn't imagine when you asked for the closed hearing as to what could be said that would be closed. I mean, we granted it because we didn't know what counsel was going to say. But why did we close this hearing? My understanding is because she is still participating, giving testimony, assisting the prosecutors. But you didn't have to tell us that in connection with this argument. It's only because we asked, right? So presumably everything else can be public knowledge that's happened here. All I can do is respond. Is there anything that was said today that would permit or require us to keep this sealed further, a reason we can't have it made public? Yeah. I defer to the prosecutor. I don't know any more than what I can share with you, have shared with you. You said it's a fairly serious matter. I mean, we granted it from counsel's presentation that something might or would be said that is confidential and to your client, but closing a hearing is a serious matter. And it should not be asked for lightly and without any good reason. I agree. Well, you did ask for it. I'm just wondering why you did that. I didn't ask for it. My predecessor did, but that's my understanding as to the reason. You didn't withdraw it. I apologize? You didn't withdraw it. No, I did not withdraw it. That's correct. When did you come on the case? Less than 30 days ago, I think, something like that. Okay. Is the government having it further? No. Okay. Well, seeing there's no reason to keep the matter sealed, the audio of the hearing will be unsealed and put, as usual, on our website. And I'm just, I don't understand why we, having come to the end of the hearing, why anybody thought this should have been sealed. Our counsel didn't move to correct the, well. But in any event, we will open it up. Before we terminate, just so I understand, is the representation that we heard here about this defendant cooperating in other investigations, is that particular piece of information public or not? Maybe the prosecutor can tell us that. I can't, Your Honor. All right. Well, that would be the only. Well, it was said during the unsealed portion of the hearing, counsel for Tedesco said, we know that Ms. Woodard testified against her client. So I think that's not a secret that she is cooperating. I thought there would be details, names, dates, or that sort. But nothing like that came up. And I. Are there further investigations underway at the moment that are outside this case? I don't believe it's additional investigations. I believe, at this point, she's simply continuing to give testimony from time to time, and that's all that was called upon. All right. It doesn't seem like a secret thing. No, again, sealing a public hearing is a very serious matter and should not be undertaken lightly. And now that we've heard everything that's to be said, I don't think there's any reason to keep it sealed. I understand. It will be unsealed and made public in a normal way. Okay. Thank you, Your Honor. Thank you, counsel. Madam, just like you said, submitted, we are adjourned. All rise.
judges: Kozinski, O'scannlain, Graber